**In re Francis Dale SAMFORD, Debtor.**

**Donald BRAMAN and Helen Braman, Plaintiffs,**

**v.**

**Francis Dale SAMFORD, Defendant.**

**Bankruptcy No. 382–02439.
Adv. No. 382–0732.**

United States Bankruptcy Court,
M.D. Tennessee.

April 18, 1984.

See also, 39 B.R. 423.

Larry K. Tolbert, Murfreesboro, Tenn., for plaintiffs.

Steven L. Lefkovitz, Nashville, Tenn., for debtor.

## MEMORANDUM

GEORGE C. PAINE, II, Bankruptcy Judge.

This adversary proceeding was initiated by the plaintiffs, Donald and Helen Braman, seeking a judgment of $120,000.00 against the debtor, Francis Dale Samford, and seeking to have that judgment declared nondischargeable. The plaintiffs also seek a judgment for interest on this sum and an award for punitive or exemplary damages. Upon consideration of the evidence presented at the hearing, exhibits, stipulations, briefs of the parties and the entire record, this court concludes that the plaintiffs should be granted a judgment of $120,000.00 plus interest and that such judgment should be declared nondischargeable.

The following shall represent findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

The plaintiffs are a retired couple, residing in Burlington, North Carolina. They have been married for more than 35 years and spent most of their lives in Ionia, Michigan, before moving to Burlington for health reasons. Both Mr. and Mrs. Braman have very limited formal education. Mr. Braman worked for 33 years as a nurse/attendant and prison guard with the State of Michigan Department of Corrections. Mrs. Braman was not employed during this time. The Bramans have two children. They presently live in an apartment in Burlington on Mr. Braman's social security and retirement pensions totaling less than $1,000.00 a month.

This proceeding concerns the relationship of both the plaintiffs and the debtor to the Sword of the Lord Foundation (hereinafter referred to as the "Foundation"). The Foundation is a long-established, non-profit fundamentalist Christian evangelistic organization with headquarters in Murfreesboro, Tennessee. It apparently owns substantial real and personal properties, has a large staff and collects and disburses substantial funds for the furtherance of its stated purpose.

Mr. Braman has been familiar with the Foundation since childhood. He was personally acquainted with the founder of the foundation, Dr. John R. Rice, and has made numerous cash donations over the years.

The plaintiffs first met the debtor, Dale Samford, in 1975. The debtor was at this time the Stewardship Director for the Foundation and had been associated with it since 1970. He had previously worked in various jobs and capacities before becoming Stewardship Director. As Stewardship Director, his major responsibility was to solicit financial contributions for the Foundation. This duty included solicitation of outright gifts as well as testamentary provisions and trust agreements whereby the Foundation was a named beneficiary. The debtor also solicited "investment" givers who would place cash sums with the Foundation on a guaranteed income basis. The Foundation would deposit or otherwise invest such funds, pay the "investor" the guaranteed return and utilize any additional earnings for the stated Foundation purposes.

The plaintiffs became interested in setting up a "trust investment" with the Foundation. They were contacted by the debtor in his capacity as Foundation Stewardship Director. After preliminary negotiations, the debtor traveled to their home in Ionia on or about July 1, 1975, and presented an agreement on behalf of the Foundation. This document was essentially a revocable trust agreement whereby the settlors were paid an annual return equal to 8½% of the trust res, with the res being donated one-half to the Foundation and one-half to the settlors' children upon the settlors' death.

This agreement was entered into by the plaintiffs, Mr. Byers, the treasurer of the Foundation, and the debtor, agent for the Foundation.

In the spring of 1978, the plaintiffs visited the Foundation headquarters in Mur-

freesboro, Tennessee. While in Murfreesboro, they met and spoke with Dale Samford. The plaintiffs toured the Foundation facilities and offices and the debtor showed them a housing project known as Sunset Square Retirement Home. Sunset Square was an apartment type residential complex where individual units were purchased or rented on a lifetime basis by Christian retirees. Food and medical services were available for tenants in need of such services. Sunset Square was operated as a separate, non-profit organization, although it was very closely aligned, supervised and controlled by the Foundation. In fact, the Foundation actively solicited tenants for Sunset Square which eventually became a wholly owned subsidiary of the Foundation.

The plaintiffs' agreement with the Foundation remained in effect until late 1978 or early 1979, when Donald Braman called the debtor to inquire about the rate of return being paid on the trust and to request an increase of this rate to more nearly match the then existing interest rates. The debtor advised Mr. Braman that he would see what could be done.

Shortly thereafter, the debtor informed Mr. Braman that either the Foundation could increase the trust income to 10.75% annually or he could recommend another investment opportunity that would yield an 11.25% annual return. Although no particulars were discussed, Mr. Braman indicated that he would be interested in the investment with the higher yield. Accordingly, Mr. Braman, pursuant to the instructions of the debtor, terminated his trust agreement with the Foundation.

On or about February 12, 1979, the debtor delivered the proceeds from the terminated Foundation trust to the plaintiffs at their residence in Ionia. These funds totaled $120,000.00, and represented substantially all of the plaintiffs' accumulated life savings. At this time, the debtor also presented the plaintiffs with a second "agreement" which was intended to be a contract between the plaintiffs and Sunset Homes Enterprises, a Tennessee corporation. In essence, the agreement provided that Sunset Homes Enterprises would receive $120,000.00, to hold and invest for a term of three years, with interest to accumulate at the annual rate of 11.25% and to be paid with the principal sum at the end of the contract term, unless renewed. This contract was executed by the plaintiffs and the debtor on behalf of Sunset Homes Enterprises.

Donald Braman testified that he was confused as to the nature of his investment. The plaintiffs had previously known and dealt with the debtor solely and exclusively in his capacity as Stewardship Director for the Foundation. The plaintiffs, therefore, each assumed that the "investment" the debtor presented was a Foundation project. In drafting his check to fund the new investment, Donald Braman first made the check payable to the Sword of the Lord Foundation. The debtor advised him this was incorrect. Mr. Braman then drafted a second check to Sunset Square Retirement Home. The debtor again advised him that this was incorrect and that the check should be made payable to Sunset Homes Enterprises, an entity separate from the Foundation. Mr. Braman complied. Mr. Braman testified that he thought the debtor's comment merely meant that Sunset Homes Enterprises was technically independent of the Foundation but nevertheless approved and closely supervised by the Foundation. Because of both their prior dealings with the debtor in his capacity as representative of the Foundation and their personal knowledge of the Sunset Square project, the plaintiffs made only the barest and most rudimentary inquiries regarding the specifics and particulars of their investment. The entire transaction was completed within a few minutes.

Unknown to the plaintiffs, in addition to his duties as Stewardship Director, the debtor also operated a small sole proprietorship known as Sunset Enterprises. Sunset Enterprises engaged in real estate development involving mainly the construction and rental of single family and duplex residences in the Murfreesboro area. Sunset Homes Enterprises, a Tennessee corpo-

ration, never existed. The debtor testified that he intended to charter such a corporation in which he would be the sole stockholder, but simply never completed the formalities.

The plaintiffs did not know, nor were they advised by the debtor, that Sunset Homes Enterprises was not a chartered corporation. The debtor failed to disclose either the fact that the putative corporation was to be a "for profit" corporation, with the debtor as sole owner, or the fact that any "investment" made to it would be completely separate from any project associated with the Foundation. The debtor testified that he assumed the plaintiffs were aware of these facts.

The plaintiffs each testified that they only intended to invest in the Foundation and that, had they known Sunset Homes Enterprises was not connected with the Foundation, they would never have given the debtor any money. The plaintiffs did not discover the true facts of their "investment" until months later when an inquiry with the Foundation revealed that it had no knowledge of the transaction and that the debtor's employment had been terminated. The plaintiffs have not been able to reobtain their investment from the debtor. Indeed, the debtor testified that he no longer possessed the plaintiffs' money, that no separate account of such money was ever maintained, that the funds were completely commingled with his personal funds and that he could not identify any particular project, improvement or item for which these funds were expended. The debtor filed a voluntary Chapter 11 petition in this court on July 29, 1982.

Upon review of the evidence presented, the court concludes that a judgment should be awarded to the plaintiff and that this judgment should be declared nondischargeable. The plaintiffs objected to the dischargeability of this debt under both § 523(a)(2)(A) as obtaining money by a false representation or under § 523(a)(4) for fraud while acting in a fiduciary capacity.[1] Since this court finds the debt at issue nondischargeable pursuant to § 523(a)(2)(A), the court need not address the plaintiffs' contention that the debt is also nondischargeable under § 523(a)(4).

As this court has stated on several occasions, the creditor must prove the following criteria in order to have its debt excepted from discharge under § 523(a)(2)(A):

(a) That the debtor made the false representations;

(b) That at the time of making them, he knew that they were false;

(c) That he made them with the intention and purpose of deceiving the creditor;

(d) That the creditor relied on such representations; and

(e) That the creditor sustained the alleged loss and damages as a result of the representations having been made.

*Everwed Co. v. Ayers,* 25 B.R. 762, 772 (Bkrtcy.M.D.Tenn.1982). *See also Heinold Commodities & Securities, Inc. v. Hunt,* 30 B.R. 425, 435 (Bkrtcy.M.D.Tenn.1983). Furthermore, it is well established that silence or concealment of a material fact may constitute a materially false representation under § 523(a)(2)(A). *See, e.g., Community Hospital of Roanoke Valley, Inc. v. Musser,* 24 B.R. 913, 918 (W.D.Va. 1982); *National Bank of North America v. Newmark,* 20 B.R. 842, 856 (Bkrtcy.E.D. N.Y.1982); *Union Mortgage and Loan v. Fox,* 13 B.R. 827, 830 (Bkrtcy.W.D.Ky. 1981); *H.C. Prange Co. v. Schnore,* 13

---

1. 11 U.S.C. § 523(a)(2) and (4) (West 1979) provide as follows:

"(a) A discharge under section ... 1141 ... of this title does not discharge an individual debtor from any debt—

. . . .

(2) for obtaining money, property, services, or an extension, renewal, or refinance [*sic*] of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity...."

B.R. 249, 252–254 (Bkrtcy.W.D.Wis.1981); *Citizens & Southern National Bank v. Thomas,* 12 B.R. 765, 768 (Bkrtcy.N.D.Ga. 1981); *Bank of Miami v. Quintana,* 4 B.R. 508, 510 (Bkrtcy.S.D.Fla.1980).

The court finds that the plaintiffs have met their burden of proof in this case. The debtor's failure to explain that the plaintiffs' $120,000.00 investment in "Sunset Homes Enterprises" was not connected with and would not benefit the Foundation was of material importance. The debtor, through his prior conversations and association with the plaintiffs, knew or should have known, that the plaintiffs desired to use their funds to benefit and further the goals of the Foundation. The debtor nevertheless failed to tell the plaintiffs that "Sunset Homes Enterprises" was not associated in any way with the Foundation, that Sunset Homes Enterprises had no connection with the Sunset Square Retirement Home, that Sunset Homes Enterprises was actually a "for profit" corporation in which the debtor was intended to be the sole stockholder and that the debtor in soliciting this investment was not acting within his capacity as Stewardship Director for the Foundation. Unaware of this information, the plaintiffs relied on the debtor's past position with the Foundation and on their prior association with the debtor in giving the debtor their $120,000.00 to invest in Sunset Homes Enterprises. This court has no doubt that the debtor failed to inform the plaintiffs of this information with the express intent and purpose of deceiving the plaintiffs. The debtor never set up a corporation in the name of "Sunset Homes Enterprises" and could not testify as to what he had used the $120,000.00 for other than the fact that he no longer possessed such sum. The court can only imply from this information that the debtor had the subjective intent to abscond with the funds entrusted to him by the plaintiffs. *See Heinold Commodities & Securities, Inc. v. Hunt,* 30 B.R. 425, 441–442 (Bkrtcy.M.D. Tenn.1983). As a result of the plaintiffs' reliance on the debtor's apparent relationship with the Foundation, the plaintiffs sustained the loss of $120,000.00. For these reasons, the court finds that the plaintiffs should be given a judgment against the debtor for $120,000.00 and that such judgment should be considered nondischargeable.

The plaintiffs have also requested an award of punitive or exemplary damages against the debtor. The court is of the opinion that such damages should not be awarded as a part of the judgment. While this court is convinced that the debtor did deceive the plaintiffs and thereby obtained $120,000.00 from them, the court is of the opinion that the plaintiffs are at least somewhat culpable for their loss. The plaintiffs had an almost "blind faith" in the debtor and failed to ask even the most rudimentary questions concerning what he intended to do with their money. Even a cursory questioning of either the debtor or some other representative with the Foundation would have revealed the true state of affairs which the debtor successfully concealed from the plaintiffs. The court will therefore DENY the plaintiffs' request for punitive or exemplary damages.

The plaintiffs have requested interest on the $120,000.00 debt owed by the debtor. When a debt is found to be nondischargeable under § 523(a)(2)(A), this court has held that the creditor is entitled to recover damages measured by the benefit-of-the-bargain rule. *Castner Knott Co. v. Wilson,* 12 B.R. 363, 370 (Bkrtcy.M.D. Tenn.1981). Pursuant to TENN.CODE ANN. § 47–14–123 and 47–14–103(2) (1979), this court may under appropriate circumstances award prejudgment interest at a rate greater than 10% per annum. See *Primm v. Foster,* 38 B.R. 639 (Bkrtcy.M. D.Tenn.1984). Accordingly, the court will award the plaintiffs interest on their $120,000.00 judgment at the contract rate of 11.25% per annum from February 12, 1979, until the date of this judgment.

The court ORDERS that a judgment be entered in favor of the plaintiffs against the debtor in the sum of $120,000.00 plus

interest. The court further ORDERS that this judgment is nondischargeable pursuant to § 523(a)(2)(A).

IT IS, THEREFORE, SO ORDERED.